John R. Manning
Attorney at Law
Ca. St. Bar No. 220874
1111 H Street, Suite 204
Sacramento, CA  95814
Telephone:  (916) 444-3994

Attorney for Defendant
Ralondria Stafford

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 09-037 MCE |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S FORMAL OBJECTIONS** |
| | ) | **TO PRESENTENCE INVESTIGATION** |
| v. | ) | **REPORT** |
| | ) | |
| RALONDRIA STAFFORD | ) | |
| | ) | Sentencing Date: Feb. 3, 2011 |
| Defendant. | ) | Time:  9:00 a.m. |
| | ) | Hon. Morrison C. England |

## I. Procedural History

Pursuant to a plea agreement, Ms. Stafford pled guilty to count 2 of the indictment, violation of 18 U.S.C. 1343, Bank Fraud.  The plea agreement stipulated to a base offense level of 7.  The parties did not stipulate loss amount or role in offense adjustments.  Ms. Stafford is free to argue for a sentence below the guideline range.

Ms. Stafford respectfully asks the Court to determine the loss amount attributable to Ms. Stafford (and Ms. Ward) is less than $200,000 and that Ms. Stafford was not a leader and therefore the 2 level increase suggested by the Probation Department is inappropriate.  In addition, and/or in the alternative, Ms. Stafford asks this Court to consider the

1

1   information and argument presented herein (and in the as yet to
2   be filed sentencing memorandum) pursuant to *United States v.*
3   *Booker* and *18 U.S.C. 3553(a)* and determine Ms. Stafford to have
4   an offense level of 11 (Ms. Stafford's criminal history is I).
5   By doing so, the Court can then sentence Ms. Stafford to a
6   probation sentence.  If the Court is reluctant to go that far,
7   Ms. Stafford asks the Court find her offense level to be no
8   greater than 13.  At this offense level (13), the Court will have
9   the option of allowing Ms. Stafford to serve at least part of her
10  sentence in some form of "alternative sentencing."

11      Society benefits not from Ms. Stafford receiving a prison
12  sentence.  Incarcerating a single mother, who has already lost
13  everything (money, home, health), fails to protect society; fails
14  to appropriately punish Ms. Stafford; and fails to provide any
15  deterrent to others.  Simply put, the law is a shield, not a
16  sword.

17      There is no doubt the crime(s) committed by Ms. Stafford
18  (and Ms. Ward) are serious and deserve punishment.  In the months
19  leading up to the incidents in this matter through today, Ms.
20  Stafford: has literally lost every single dollar she has ever
21  made and has filed for bankruptcy protection; watched helplessly
22  as her businesses went bankrupt one after the other; has no home
23  or assets and lives with her mother; has developed serious
24  medical issues which are adversely affecting her heart (see, PSR
25  pg 14 ln 38); and, has faced her community, her family and
26  friends with her reputation rather notoriously and publicly
27  destroyed.  As all of these events are playing out, Ms. Stafford
28  was forced to flee with her young son from her abusive marriage.

1  Her (now ex) husband refused to pay either alimony or child
2  support for years...essentially adopting the position that since
3  she (Ms. Stafford) dared to leave him...he wasn't obligated to
4  support either her or their son.

5      Ms. Stafford has committed two crimes in her entire
6  life...14 months apart...two years ago. Ms. Stafford and Ms. Ward
7  did not cause the economic apocalypse that has taken hold in this
8  country; nor could she have foreseen such an event.  The
9  defendants did not cause the "loss" amount the Government is
10 attributing to them and the resulting offense level based on the
11 claimed loss amount is disproportional to the conduct and results
12 in an unjustly harsh sentence.

13     For the above stated reasons, (and/or any other
14 justification the Court deems fair and just), after the
15 sentencing hearing in this case, the Ms. Stafford requests this
16 Court adopt the objections and arguments articulated herein and
17 determine Ms. Stafford to have an offense level of 11 (or, in any
18 event a level no greater than 13) and sentence her accordingly.

19 **II. Formal Objections to the Pre Sentence Report**

20     **The Offense Conduct**

21 Page 5 ln 9:  "…wherein Stafford recruited and manipulated
22 friends…"  "Recruited" overstates the conduct; "manipulated" is
23 gratuitous.  Both deals were business propositions, sincerely
24 made, that ended up bad.  "CS" and "JG" were willing, informed,
25 partners in business transactions they fully embraced.  They
26 volunteered; they were not recruited.  They were fully aware of
27 the circumstances and eagerly participated...they were not
28 manipulated.

3

1    "Specifically, Stafford assisted and directed Ward..."   Ms.
2  Stafford assisted Ms. Ward, but did not direct.   They were equal
3  partners.   Moreover, Ms. Ward confessed that she, and she alone,
4  was responsible for ALL of the loan documentation involved in the
5  sale/purchase of the property located at 230 Echo Summit Road.

6    Ms. Stafford and Ms. Ward discussed, as partners may, the
7  loan application for "CS" related to the property owned by Ms.
8  Ward.   Ms. Ward, not Ms. Stafford is the loan agent.   Ms. Ward
9  knows full well what lenders want to see on a loan application.
10 Ms. Ward filled out the forms and sent in all the documentation.
11 The sale of this property was for Ms. Ward's benefit, as she was
12 going to lose the house in foreclosure.   It was a partnership;
13 neither partner directed the other.

14    The point here, is not to say Ms. Stafford was not involved
15 and did not receive a benefit.   Obviously she was involved and
16 did benefit.   Nor is the point to lay blame on Ms. Ward.   Rather,
17 this information offered solely to illustrate that the
18 relationship between Ms. Stafford and Ms. Ward was an equal
19 partnership.   Ms. Stafford has admitted her guilt; accepts
20 responsibility and is extremely remorseful.

21 Pg. 6 ln 10: "CS...recruited to purchase Ward's residence...under
22 false pretenses."   "CS" was not recruited; she took advantage of
23 a business opportunity.   Moreover, to the extent that "CS" was
24 made aware of the enterprise, and offered the business
25 proposition regarding the property, Ms. Ward was equally
26 responsible.   Ms. Stafford and Ms. Ward were partners and jointly
27 reached out to potential investors.   Again, Ms. Ward admitted

28

4

1  working with "CS" on the loan application suggesting she (Ms.
2  Ward) was highly involved in ensuring "CS"s involvement.

3       There is noting to suggest "CS" was induced into this scheme
4  under false pretenses.  "CS" made admissions to law enforcement
5  indicating otherwise.  Moreover, the parties signed a contract
6  and actually used the term "for creative financing purposes only"
7  right in/on the contract.  Notwithstanding the dubious
8  enforceability of this contract (or its legality), it is
9  difficult to see nefarious intent ("false pretenses") when the
10 parties memorialize an agreement such as this.

11      "...$97,000 was paid to Ward, $31,000 of which was provided
12 to Stafford, with an additional $30,000 distributed to her
13 creditors." Ms. Ward had been unable to pay her bills for some
14 time leading up to this transaction.  Ms. Stafford had paid many
15 bills on behalf of Ms. Ward.  By selling her home, Ms. Ward
16 received the dual benefit of putting money in her pocket and
17 paying her sister (Ms. Stafford) back.

18      Again, none of this is meant to suggest Ms. Ward was more
19 culpable than Ms. Stafford.  This information is offered only to
20 help illustrate that this was a partnership.  Both partners
21 benefitted; both partners interacted with the straw buyers; both
22 partners manipulated documents; both partners are equally
23 culpable...neither lead the other, or was in charge; and, both
24 partners have humbly and sincerely admitted their guilt.

25      "The home foreclosed on April 5, 2007 and later the same
26 year, the house sold in foreclosure for $800,000, a $200,000
27 loss."  A public record search shows the house sold at

28

foreclosure for $851,253.06 (Exhibit "A").[1]  A review of the
Zillow (www.zillow.com) report for 9427 Berkshire Lane, Vallejo,
CA., is revealing. On April 27, 2007, approximately one year
AFTER the home was purchased by the straw buyer and less than a
month after the home was purchased at foreclosure, the home was
listed for $999,999. (See Exhibit "B") Clearly, at the time the
property was sold at foreclosure, the industry (real estate and
mortgage banking) believed this property to be "worth"
(approximately) $1,000.000.  This is buttressed by the fact that
Solano County assessed the property for tax purposes in 2006 as
having a value of $834,666 and in 2007 as having a value of
$1,020,000 (Exhibit "B").

    Market forces, wholly unrelated to the defendants and
impossible for them to have foreseen, are certainly in part to
blame for a significant percentage of the loss amount.  Between
April 27, 2007, (when the property was initially listed following
the foreclosure purchase) and October 9, 2007, the price of the
home was reduced 6 times; the listing price dropped from $999,999
to $805,000 (Exhibit "B").  At the end of October 2007, the
property was removed from any listings and the property was not
listed again for sale until January 2, 2008; with an asking price
of $656,250.  This downward spiral continued until the home was
eventually sold in late October 2008 for $305,000 (Exhibit "B").
In 18 months, between April 2007 and October 2008, the value of

---

[1]Using the crude and ultimately inappropriate accounting
technique offered by the Government to ascertain loss; the "loss"
associated with this property is (+/-) $148,747...not $200,000.

6

1   the home fell over 66% ($999,999 to $305,000).  It is simply
2   impossible and completely unfair, to hold the defendant's solely
3   responsible for losses that are at least partially a result of
4   forces completely beyond their control and totally unforeseeable.

5       <u>Pg 7 ln 12:</u>  Ms. Stafford was having difficulty with her
6   mortgage payments.  In no small part due to her husband refusing
7   to pay either child support or alimony.

8       "Stafford recruited..."JG"..."  "JG" was not recruited.
9   "JG" and Ms. Stafford had a personal and professional
10  relationship going back years.  "JG" had been involved in
11  business ventures previously with Ms. Stafford and worked
12  with/for Ms. Stafford. Moreover, to the extent "JG" was brought
13  into the transaction, Ms. Ward worked EXCLUSIVELY with "JG" on
14  the loan application and documentation; thereby recruiting her
15  into the business transaction.

16      Again, the point here is not that Ms. Stafford is
17  innocent...we're past that.  The point here is this was a
18  partnership between all the parties…including the so-called straw
19  buyers.  More specifically, the partnership between Ms. Stafford
20  and Ms. Ward was such that BOTH were equally involved in
21  maintaining the involvement of the "straw buyer(s)."

22      "Later that same year the residence sold at foreclosure for
23  approximately $400,000 resulting in a $75,000 loss for the bank."
24  A public records search shows this property sold at foreclosure
25  for $407,448.40 (Exhibit "C").  Using the Government's accounting
26  system, that results in an (alleged) loss of $67,551.60.   Again,
27  market forces are at least partially responsible for whatever the
28  loss associated with this property.  The Zillow report (Exhibit

1  "D") for this property is similar to that of 9427 Berkshire Lane,
2  Vallejo, CA (Exhibit "B").  In the span of one year, between
3  August 2005 and April 2006, the sale price of the home nosed-
4  dived (approximately) 14% ($475,000 to $407,448.06).  Moreover,
5  the property was sold again in June of 2007 for $360,000 and is
6  presently for sale again and is listed for $162,000.  The same
7  market forces that drove the price down between August 2005 and
8  April 2007, are still, obviously, forcing the sale price down.
9  It is both impossible and unfair to attribute the entire loss in
10 value of this property to the defendants.
11 Pg 8 ln 15:  "…Stafford had directed her.."  This is simply
12 impossible.  Ms. Ward, not Ms. Stafford is the loan agent. Ms.
13 Ward, not Ms. Stafford, fills out and processes loan applications
14 for a living.  Ms. Ward knows full well, based on her career as a
15 loan agent, what lenders want to see on an application.  Ms.
16 Ward, based on her experience, knows this better than Ms.
17 Stafford.  Ms. Ward and Ms. Stafford discussed the loan
18 application, as is typical in a partnership.  This does not mean
19 Ms. Stafford had any ability to *direct* Ms. Ward to do anything.
20     **Victim Impact**
21 Pg 9 ln 17-18: The defense objects to the amount of restitution,
22 $200,000, claimed herein as there is (I believe) nothing in the
23 discovery to support this figure.  The Defense further objects to
24 the statement..."[T]he total intended and actual loss..."  The
25 was no "intended loss."  Not a single page in the discovery
26 suggests any "intended loss;" nor does any statement in the
27 discovery suggest as much.  Any reference to "intended loss"
28 should be stricken frm the PSR as it is very clear from the

discovery no one was supposed to lose money.  But for the
economic cataclysm still present in this country (and the world),
everyone would have put money in their pocket...including the
straw buyers and the lenders.

The Defense objects to this amounts reference in the PSR in-
so-far-as the loss is a result of market forces, not the conduct
of the Defendant's (as somewhat laboriously noted herein).
Finally, the Defense notes neither the Government, nor PNC Bank,
has produced even a single document indicating they (PNC)
suffered a loss of any kind.  Moreover, ordering restitution to
PNC may be "double-dipping" as PNC may well have received an off-
set for whatever their (National City Mortgage's) loss may have
been.  PNC is not a "victim" in any event as they (PNC), were not
one of the lenders to begin with.  PNC bought out National City
Mortgage in October 2008, some 18 months AFTER the property was
sold at foreclosure.  For the Court to find a loss amount, or
order restitution, the alleged victim needs to offer some indicia
of loss and neither the now defunct National City Mortgage, nor
its corporate overlord PNC, have offered any proof of any loss.
Pg 9 ln 19:  The defense objects to the amount of restitution,
$75,000, claimed.  The Defense objects to this amount in-so-far-
as the loss is a result of market forces, not the conduct of the
Defendant's.

Both National City Mortgage and People Choice Home Loans are
out of business because they wrote numerous, dubious, sub-prime
loans.  A simple *Google* search provides a dizzying and somewhat
depressing wealth of information.  They have (if they still
existed) "unclean hands."  Neither Ms. Stafford, nor Ms. Ward,

1 should be made to bare the entire burden of whatever the loss
2 amount is here as corporate greed and malfeasance, coupled with
3 an unforeseeable, economic black hole opening over America,
4 significantly contributed to the loss amount.

5 **Offense Level Computations**

6 <u>Pg 10 ln 25:</u> First, the defense object to any reference
7 suggesting "intended loss." To suggest there is/was any intended
8 loss in this matter is completely speculative. The Defendant's
9 absolutely believed (like so many others...including the lenders)
10 that the housing market would continue to be a solid investment.
11 Both of the deals involved in this matter gave the Defendant's
12 the ability take possession of the home(s) in the future;
13 specifically because they (the Defendant's) believed that housing
14 prices would continue to rise.

15 The Defense further objects to the loss amount as calculated
16 at $250,000. The Defense believes the amount of loss reflects
17 market forces as opposed to the Defendant's conduct. The value
18 of the properties was not inflated by the Defendant's at the time
19 the properties were sold. The Bank suffered a loss (assuming
20 they did) because the house was worth less when it was sold, than
21 when it was purchased. That would be true regardless of the
22 Defendant's conduct.

23 It does not change the Guideline calculation, but using the
24 Government's formula, the (alleged) "loss" is actually $216,299.
25 However, it is worth noting that a loss between $200,000 and
26 $400,000 gives the defendant's a 12 level increase, rather then a
27 10 level increase for a loss between $120,000 and $199,999. In
28 Ms. Stafford's case, that distinction could add up to a year on

1  to her sentence.

2      In calculating loss pursuant to U.S.S.G 2B1.1(b), the
3  general rule is the Court should apply the greater of the actual
4  or intended loss.  U.S.S.G. 2B1.1 cmt. N3(A).  The defense
5  submits there was never any intended loss in this
6  matter...leaving the determination of actual loss as the
7  remaining issue.

8      The Court "need only make a reasonable estimate of loss"
9  based on the available information and a number of factors "as
10 appropriate and practicable under the circumstances."  U.S.S.G.
11 2B1.1 cmt. 3[C].  This approach is meant to reflect a reasonable
12 approximation of the losses suffered by the lending institutions
13 related to the Defendant's conduct.  See, United States v.
14 Haddock, 12 F.3d 950, 961 (10th Cir. 19930 ("[O]nly net loss is
15 considered; anything received from the defendant in return
16 reduces the actual loss."; United States v. Wright, 60 F.3d 240,
17 242 (6th Cir. 1995) (noting that "[l]oss' should not include
18 amounts that a bank can and does easily recover by foreclosure,
19 setoff, attachment, simple demand for payment, immediate recovery
20 from the actual debtor and other similar legal remedies.");
21 United States v. Berger, 473 F.3d 1080, 1104-1108 (9th Cir. 2007)
22 (holding that in determining actual loss for restitution
23 purposes, in cases involving falsified loan documents, the
24 District Court properly calculated loss based on loan
25 advancements received due to fraudulent application and then
26 discounted that figure by the percentage the banks recovered when
27 they foreclosed on the defendants's company's assets).

28      However, "[t]he Guidelines do not present a single universal

1  method for loss calculation under 2B1.1-nor could they, given the

2  fact intensive and individualized nature of the inquiry." <u>United</u>

3  <u>States v. Crandell</u>, 525 F.3d 907, 912 (9th Cir. 2008)(quoting,

4  <u>United States v. Zolp</u>, 479 F.3d 715, 718 (9th Cir. 2007)).

5  Therefore, U.S.S.G. "2B1.1 is not to be applied mechanically in

6  valuing loss" and sentencing courts are instructed to "taken

7  realistic, economic approach to determine what losses the

8  defendant truly caused or intended to cause, rather than the use

9  of some approach which does not reflect the monetary loss."

10 <u>United States v. Stoddard</u>, 150 F.3d 1140, 1145-1146 (9th Cir.

11 1998)(quoting, <u>United States v. Allison</u>, 86 F.3d 940, 943 (9th

12 Cir. 1996)).

13     Both case law and the Guidelines make it clear the Court

14 must consider more than the superficial "analysis" offered by the

15 Government when determining the loss amount.  Here, market

16 forces, beyond the control of the defendant's and unforeseeable

17 to them (and everyone else apparently) are to blame for a

18 significant amount of the loss suffered in this case.  The

19 defendant's can not be held accountable for losses they did not

20 cause and could not foresee.

21 <u>Pg 11 ln 26:</u> "In essence Stafford was the organizer, leader and

22 manager in perpetrating the bank fraud and other relevant conduct

23 in the offense."  The Defense (obviously) objects to this

24 enhancement.  The discovery is insufficient to establish Ms.

25 Stafford was manager (or supervisor) in the criminal activity at

26 the heart of this matter.  Because the Government has not met

27 its' burden, the 2 level enhancement pursuant to USSG 3B1.1[c]

28

1 should not be applied to Ms. Stafford's offense level
2 calculation(s).

3     It is the Government's burden, to establish, by a
4 preponderance of the evidence, that Ms. Stafford functioned as a
5 manager or supervisor.  United States v. Hoac, 990 F.2d 1099,
6 1110-1111 (9th Cir. 1993).  The Court must "determine whether the
7 defendant 'exercised some control over others involved in the
8 commission of the offense [or was] responsible for organizing
9 others for the purpose of carrying out the crime.'"  United
10 States v. Sandoval, 146 F.3d 712, 717 (9th Cir. 1998); citing
11 United States v. Mares-Molina, 913 F.2d 770, 773 (9th Cir. 1990).
12 Absent a showing by the Government the "defendant had control
13 over others, even a defendant with an important role in the
14 offense cannot be deemed a manager."  Id.; citing, Hoac, 990 E.2d
15 at 1110-1111.

16     Ms. Ward and Ms. Stafford were partners; neither lead;
17 neither directed.  Ms. Stafford did know both "straw buyers."
18 However, Ms. Ward prepared, by her own admissions ALL the loan
19 documents related to "JG." (230 Echo Summit Road, Vallejo, CA)
20 Ms. Ward met with "JG" and got her information and forwarded all
21 the information to the lender.  Given that Ms. Ward is the loan
22 agent and in the case of "JG," admitted to being solely and
23 exclusively responsible for the loan documents, it is impossible
24 to say Ms. Stafford had a leadership role.

25     In the case of "CS," (9427 Berkshire Road, Vallejo, Ca.),
26 Ms. Ward was desperate to sell her house before she lost it in
27 foreclosure.  Ms. Stafford did not have to "lead" in-so-far-as
28 Ms. Ward couldn't wait to do her part, fill out bogus loan

1  documents, so *she* could get out of *her* house.  Ms. Ward and Ms.
2  Stafford, as partners do, had an agreement on how the funds would
3  be dispersed...that, in itself, is not indicative of leadership.
4  Nor is it indicative of leadership that Ms. Stafford received
5  more money than Ms. Ward.  Ms. Stafford, as Ms. Ward admitted,
6  had been paying Ms. Ward's mortgage (and personal bills) for some
7  time.  Finally, Ms. Stafford could not do many of these things
8  herself...draft and file loan document...arrange for payment
9  dispersal...these HAD to be done by Ms. Ward...as it was *her*
10 home.

11      This is, of course, not to say Ms. Stafford is not culpable.
12 Obviously she is/was and she has admitted her guilt; accepts
13 responsibility and is extremely remorseful.  However, Ms.
14 Stafford is no more culpable than her business partner and
15 sister, Ms. Ward.  Therefore, the Defense objects to the two
16 level enhancement in this section.

17 Total Offense Level (18):  The Defense believes the correct
18 offense level should be significantly less than 18 as Ms.
19 Stafford was not a leader, and neither defendant is wholly (or
20 jointly) responsible for all the losses (whatever they may be)
21 suffered herein.

22      **Impact of Plea Agreement**

23 Pg 18 ln 56:  The Defense agrees with the comments in this
24 section (the opposite of an objection I guess?).  The Defense
25 further notes, the Government is receptive to even a further
26 reduction in the sentence given the language of the plea
27 agreement.  Obviously, the Government is not going to ask for
28 less time, but they would be willing to agree with the Probation

1 Department should Probation make such a suggestion.

2    **Departure(s)**

3 Pg 18 ln 57:  To the extent the plea agreement allows for

4 argument under this section, the Defense incorporates the

5 arguments in the following sections here.  The Defense will also

6 submit a Sentencing Memorandum addressing this issue.

7    **18 USC 3553(a)[2]**

8 Pg 18/19 ln 58-65:

9     The Defendant (and her sister) are women with no criminal

10 backgrounds what-so-ever.  Neither has been in trouble either

11 before, or since these incidents.  Both are raising young

12 children (Ms. Stafford's boy is about 10 years old).  Ms.

13 Stafford escaped a destructive and abusive marriage.  This

14 incident, while serious, was limited to their own property(s).

15 Despite owning a real estate company, neither Ms. Stafford, nor

16 Ms. Ward, appear to have made this type of conduct a practice.

17 It appears both women found themselves in desperate times

18 financially.  Ms. Stafford had left her abusive husband and was

19 trying to support herself and her son alone.  Desperation is by

20 no means an excuse or justification for criminal conduct.  It

21 does, however, shed some light on how two women with no criminal

22 history and who were hard working, successful, pillars in/of

23 their community, could have crashed so hard on the rocks.  Given

24 the relationship between the Defendant's and the "straw buyers,"

25 it seems clear to me the Defendant's never intended it to work

26 ────────────────

27     [2]The Defense intends to further and more fully argue the

28 3553 factors in an as yet to be filed sentencing memorandum.

1  out this way.  That is, they really expected (well, hoped) to be
2  able to hold the property(s) until the good times returned.

3       The amount of loss in this matter (assuming for this moment
4  it is at, or near, $275,000) seems to drastically overstate the
5  criminal conduct and expose both Defendant's to unduly harsh
6  punishment(s).

7       With reasonable and appropriate manipulation of her offense
8  level (to an 11, within Zone B of the U.S.S.G), Ms. Stafford is
9  eligible for Probation and the Defense believes such a sentence
10  sufficient to reflect the serious nature of this offense.  (The
11  Guideline range for an offense level 11, CH I, is 8-14 months.)

12       Alternatively, the Defense requests a reduction to an
13  offense level no greater than 13 (The Guideline range for an
14  offense level 13, CH I, is 12-18 months and is within Zone C of
15  the U.S.S.G) A sentence of no more than 18 months would be at the
16  upper end of Zone C and Ms. Stafford would potentially be
17  eligible for home confinement (electronic monitoring) or some
18  other form of custody/alternative sentencing.

19       The Defense believes, absent the 2 level leadership
20  enhancement recommended by Probation, Ms. Stafford would have an
21  offense level of 16, CH I.  Her guideline range would be 21-27
22  months.  The request does not represent a huge downward
23  departure, except the Defense requests home confinement
24  (electronic monitoring).  Alternatively, the Defense requests a
25  sentence of one year and one day.  (This could also be
26  accomplished with a 3 level downward departure from offense level
27  16.)

28

1    Given Ms. Stafford's total lack of criminal record, a
2    sentence as suggested by the Defense absolutely reflects the
3    seriousness of the offense and will serve as a deterrent.  Given
4    Ms. Stafford's total lack of criminal history, there is virtually
5    no chance she will EVER re-offend.  Ms. Stafford's career in real
6    estate is over, her businesses are defunct and she has shamed
7    herself and her family.  The public has nothing to fear from Ms.
8    Stafford...she wishes only to raise her son and try to restore
9    her reputation.

10    Presently the Defendant is in counseling and has been for
11    some time.  Ms. Stafford is availing herself to benefits of
12    counseling and attempting to deal with her demons.  Counseling
13    (indeed, even additional counseling) would serve the Defendant
14    and society far better than a period of incarceration.

15

16                              **CONCLUSION**

17        For the above stated reasons, (and any other
18    justification the Court deems fair and just), after the
19    sentencing hearing in this case, Ms. Stafford requests that the
20    Court adopt the objections and sentencing scheme detailed herein.

21

22        Dated: January 20, 2011

23

24                                      Respectfully submitted,

25

26                                       /s/ John R. Manning
                                        John R. Manning
27                                      Attorney for Defendant
                                        Ralondria Stafford
28

                                 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit "A"

# 9427 Berkshire Lane, Vallejo CA

**First American Title Co.**
WHEN RECORDED MAIL TO:

NATIONAL CITY MORTGAGE CO.
3232 NEWMARK DRIVE
MIAMISBURG OH 45342

TRA # 007013
Trust No. 1088917-05
Loan No. XXXXXX6592
3098078-VO

MAIL TAX STATEMENT TO:

Same as above

Recorded in Official Records, Solano County          4/05/2007
                                                      1:35 PM
**Marc C. Tonnesen**                                   AR23
Assessor/Recorder                                      22

08  First American Title Co

Doc#:  200700040080    Titles:  1    Pages:  3

| | Fees | 13.00 |
| | Taxes | 0.00 |
| | Other | 0.00 |
| | PAID | $13.00 |

Space Above This Line For Recorder

Documentary Transfer Tax $__0__
_XX_Grantee was the foreclosing beneficiary.
consideration $851,253.06
unpaid debt $851,253.06
non exempt amount $
_XX_Computed on the consideration or value of property
conveyed.
__Computed on the consideration of value less liens or
encumbrances remaining at time of sale.

Signature of Declarant or Agent       **Lynn Stegall**
AP# 0183-061-160

First position

## TRUSTEE'S DEED UPON SALE

**CAL-WESTERN RECONVEYANCE CORPORATION** (herein called trustee)
does hereby grant and convey, but without covenant or warranty, express or implied to
**JP MORGAN CHASE BANK AS TRUSTEE**

(herein called Grantee) the real property in the county of SOLANO, State of California described as follows:
PARCEL ONE: REAL PROPERTY IN THE CITY OF VALLEJO, COUNTY OF SOLANO, STATE OF CALIFORNIA,
BEING ALL OF LOT 126 AS SHOWN ON THAT FINAL MAP OF NORTHGAGE HYDE PARK MORE
COMPLETELY DESCRIBED IN ATTACHED EXHIBIT A.
The street address and other common designation, if any, of the real property described above is purported to be:
9427 BERKSHIRE LANE
VALLEJO CA 94591

This conveyance is made pursuant to the authority and powers vested in said Trustee, as Trustee, or Successor Trustee, or
Substituted Trustee, under that certain Deed of Trust executed by
CONSUELA STEWART, A SINGLE WOMAN

as Trustor, recorded April 19, 2006, as Document No. 200600049206, in Book XX, page XX, of Official Records in the Office of
the Recorder of SOLANO County, California; and pursuant to the Notice of Default recorded September 25, 2006, as Document
No. 200600120735 in Book XX, page XX of Official Records of said County, Trustee having complied with all applicable
statutory requirements of the State of California and performed all duties required by said Deed of Trust, including, among other
things, as applicable, the mailing of copies of notices or the publication of a copy of the notice of default or the personal delivery
of the copy of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof.

TDUSCA.DOC                        Page 1 of 2                        Rev. 01-12-2006

TRA #   007013
Trust No. 1088917-05
Loan No. XXXXXX6592

At the place fixed in the Notice of Trustee's Sale, said Trustee did sell said property above described at public auction on
**February 22, 2007** to said Grantee, being the highest bidder therefore, for **$851,253.06** cash, lawful money of the United States, in
satisfaction pro tanto of the indebtedness then secured by said Deed of Trust.

**CAL-WESTERN RECONVEYANCE CORPORATION**

Dated:   February 22, 2007

Yvonne J. Wheeler, A.V.R.

STATE OF CALIFORNIA   }
                                              } ss:
COUNTY OF SAN DIEGO   }

On ____2-22-07_____ before me, _____**N. Yost**_____,
a Notary Public in and for said state, personally appeared
                    **Yvonne J. Wheeler, A.V.P.**

personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

(this area for official notary seal)

N. YOST
COMM. # 1493525
NOTARY PUBLIC-CALIFORNIA
SAN DIEGO COUNTY
My Comm. Exp. June 1, 2008

TS#1088917-05

# Exhibit A

**PARCEL ONE:**

REAL PROPERTY IN THE CITY OF VALLEJO, COUNTY OF SOLANO, STATE OF CALIFORNIA, BEING ALL OF LOT 126 AS SHOWN ON THAT FINAL MAP OF NORTHGAGE HYDE PARK FILED ON MARCH 30, 2004 , IN BOOK 78 OF FINAL MAPS, AT PAGE 80, SOLANO COUNTY RECORDS, AND A PORTION OF PARCEL 4-A AS MODIFIED BY THAT LOT LINE ADJUSTMENT RECORDED ON JULY 7, 2004, IN INSTRUMENT NUMBER 2004-93155, SOLANO COUNTY RECORDS, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 126, THENCE ALONG THE EAST LINE OF SAID LOT 126 AND ITS SOUTHERLY EXTENSION SOUTH 00 DEGREES 43' 52" WEST, 115.70 FEET; THENCE NORTH 89 DEGREES 16' 08" WEST, 37.33 FEET; THENCE ALONG THE WEST LINE OF SAID LOT 126 AND ITS SOUTHERLY EXTENSION NORTH 00 DEGREES 43' 52" EAST, 70.39 FEET; THENCE ALONG SAID LINES OF LOT 126 THE FOLLOWING COURSES: NORTH 89 DEGREES 16' 08" WEST; 8.00 FEET; THENCE NORTH 00 DEGREES 43' 52" EAST, 45.31 FEET; THENCE SOUTH 89 DEGREES 16' 08" EAST, 45.33 FEET TO THE POINT OF BEGINNING, CONTAINING 4,682 SQUARE FEET OR 0.107 ACRES, MORE OR LESS.

EXCEPTING THEREFROM

A. ALL OIL RIGHTS, MINERAL RIGHTS, NATURAL GAS RIGHTS AND RIGHTS TO ALL OTHER HYDROCARBON BY WHATEVER NAME KNOW, TO ALL GEOTHERMAL HEAT AND TO ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING (COLLECTIVELY, "SUBSURFACE RESOURCES"); AND

B. THE PERPETUAL RIGHT TO DRILL, MINE EXPLORE AND OPERATE FOR AND TO PRODUCE, STORE AND REMOVE ANY OF THE SURFACE RESOURCES ON OR FROM SAID PROPERTY, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN SAID PROPERTY, WELLS TUNNELS AND DIRECTIONALLY DRILLED WELLS TUNNELS AND SHAFTS WITHIN OR BEYOND THE EXTERIOR LIMITS OF SAID PROPERTY, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, BUT WITHOUT THE RIGHT TO DRILL, MINE, EXPLORE, OPERATE, PRODUCE, STORE OR REMOVE ANY OF THE SUBSURFACE RESOURCES THROUGH OR IN THE SURFACE OR THE UPPER FIVE HUNDRED FEET (500') OF THE SUBSURFACE OF SAID PROPERTY.

**PARCEL TWO:**

EASEMENTS FOR ACCESS, INGRESS, EGRESS, DRAINAGE, ENCROACHMENT, SIDEYARD, (IF APPLICABLE) AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATIONS.



# Exhibit "B"

# Zillow information-9427 Berkshire Lane, Vallejo CA

**Price History**

| Date | Description | Price | % Chg | $/sqft | Source |
|------|-------------|-------|-------|--------|--------|
| 10/24/2008 | Sold | $305,000 | -39.0% | $109 | Public Record |
| 09/23/2008 | Listing removed * | $500,000 | -- | $180 | Postlets |
| 08/08/2008 | Listed for sale * | $500,000 | -23.8% | $180 | Postlets |
| 06/02/2008 | Listing removed * | $656,250 | -- | $236 | |
| 01/02/2008 | Listed for sale * | $656,250 | -18.5% | $236 | Agent |
| 10/22/2007 | Listing removed * | $805,000 | -- | $290 | |
| 10/09/2007 | Price change * | $805,000 | -5.3% | $290 | -- |
| 09/24/2007 | Price change * | $850,000 | -3.1% | $306 | -- |
| 08/19/2007 | Price change * | $877,500 | -2.5% | $316 | -- |
| 07/18/2007 | Price change * | $899,900 | -2.9% | $324 | -- |
| 06/20/2007 | Price change * | $926,500 | -5.0% | $334 | -- |
| 05/18/2007 | Price change * | $974,900 | -2.5% | $351 | -- |
| 04/27/2007 | Listed for sale * | $999,900 | -0.0% | $360 | Agent |
| 04/19/2006 | Sold | $1,000,000 | 22.2% | $360 | Public Record |
| 12/30/2004 | Sold | $818,373 | -- | $295 | Public Record |
| Fewer entries | | | *not included in calculating Zestimate | | |

**Tax History**

| Year | Taxes paid | % Change | Tax assessment | % Change |
|------|-----------|----------|----------------|----------|
| 2010 | $7,821 | -- | $375,000 | -3.8% |
| 2009 | $7,821 | -36.8% | $390,000 | -50.3% |
| 2008 | $12,377 | -17.7% | $784,000 | -23.1% |
| 2007 | $15,042 | 19.8% | $1,020,000 | 22.2% |
| 2006 | $12,558 | 2.4% | $834,666 | 2.0% |
| 2005 | $12,266 | -- | $818,300 | -- |
| Fewer entries | | | | |

**Maps and Views**

**Financing**

# Exhibit "C"

# 230 Echo Summit Road, Vallejo CA

WHEN RECORDED MAIL TO:

EMC MORTGAGE CORPORATION
909 HIDDEN RIDGE DRIVE, SUITE #200
IRVING TX 75038

TRA # 007000
Trust No. 1083696-02
Loan No. XXXXXX7079

MAIL TAX STATEMENT TO:

Same as above

| | | |
|---|---|---|
| Recorded in Official Records, Solano County | | 8/05/2006 |
| **Marc Tonnesen** | | 9:52 AM |
| Assessor/Recorder | | AR21 |
| | | 22 |

**P TCS**

Doc#: **200600111646**    Titles:  1    Pages:  3

| | |
|---|---|
| Fees | 13.00 |
| Taxes | 0.00 |
| Other | 0.00 |
| PAID | $13.00 |

Space Above This Line For Recorder

Documentary Transfer Tax $.00
X Grantee was/was not the foreclosing beneficiary.
consideration $407,448.40
unpaid debt $407,448.40
non exempt amount $
_Computed on the consideration or value of property
conveyed.
_Computed on the consideration of value less liens or
encumbrances remaining at time of sale.

Signature of Declarant or Agent
APN 0067-252-210

APN# 0067-252-210

6704493

## TRUSTEE'S DEED UPON SALE

CAL-WESTERN RECONVEYANCE CORPORATION (herein called trustee)
does hereby grant and convey, but without covenant or warranty, express or implied to
LASALLE BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR
CERTIFICATEHOLDERS OF BEAR STEARNS ASSET BACKED SECURITIES*

(herein called Grantee) the real property in the county of SOLANO ,State of California described as follows:
LOT 63, AS SHOWN ON THE MAP ENTITLED: "DELTA HIGHLANDS UNIT 2", FILED IN THE OFFICE OF THE
RECORDER OF SOLANO COUNTY, CALIFORNIA ON JULY 11, 1973 IN BOOK 27 OF MAPS, AT PAGE(S) 82.    *I
LLC, ASSET BACKED-CERTIFICATES, SERIES 2006-PC1
The street address and other common designation, if any, of the real property described above is purported to be:
230 ECHO SUMMIT ROAD
VALLEJO CA 94589

This conveyance is made pursuant to the authority and powers vested in said Trustee, as Trustee, or Successor Trustee, or
Substituted Trustee, under that certain Deed of Trust executed by
JULIA GANT, A MARRIED WOMAN AS HER SOLE AND SEPARATE
PROPERTY
as Trustor, recorded August 22, 2005, as Document No. 200500127385, in Book XX, page XX, of Official Records in the Office
of the Recorder of SOLANO County, California; and pursuant to the Notice of Default recorded May 04, 2006, as Document No.
200600056537 in Book XX, page XX of Official Records of said County, Trustee having complied with all applicable statutory
requirements of the State of California and performed all duties required by said Deed of Trust, including, among other things, as
applicable, the mailing of copies of notices or the publication of a copy of the notice of default or the personal delivery of the copy
of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof.

TDUSCA.DOC                          Page 1 of 2                          Rev. 01-12-2006

TRA #   007000
Trust No.  1083696-02
Loan No.  XXXXXX7079

At the place fixed in the Notice of Trustee's Sale, said Trustee did sell said property above described at public auction on August 29, 2006 to said Grantee, being the highest bidder therefore, for $407,448.40 cash, lawful money of the United States, in satisfaction pro tanto of the indebtedness then secured by said Deed of Trust.

CAL-WESTERN RECONVEYANCE CORPORATION

Dated:  August 29, 2006

Yvonne J. Wheeler, A.V.P.

STATE OF CALIFORNIA   }
                      } ss:
COUNTY OF SAN DIEGO   }

On  8-29-06  before me,  J. Reed                     ,
a Notary Public in and for said state, personally appeared

**Yvonne J. Wheeler, A.V.P.**

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

J. REED
COMM. # 1677811
NOTARY PUBLIC-CALIFORNIA
SAN DIEGO COUNTY
My Comm. Exp. June 25, 2010

Signature _____

(this area for official notary seal)

# Government Code 27361.7

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary _J. Reed_

Commission Number _1677811_

Commissioned in _SAN DieGo_

Date Commission Expires _JUN 25, 2010_

Vendor ID number _PE01_

Date: _9/5/06_

Signature

_TCJ_

Firm Name (if any)

END OF DOCUMENT

c:\recorder\forms\notary seal

# Exhibit "D"

# Zillow information-230 Echo Summit Road, Vallejo CA

## Price History

| Date | Description | Price | % Chg | $/sqft | Source | |
|------|-------------|-------|-------|--------|--------|---|
| 11/24/2010 | Price change * | $162,000 | 231% | $102 | AHL Inc | |
| 10/10/2010 | Price change * | $49,000 | -69.8% | $31 | Auction.com | |
| 09/18/2010 | Price change * | $162,000 | -5.3% | $102 | AHL Inc | |
| 08/12/2010 | Price change * | $171,000 | -17.7% | $108 | AHL Inc | |
| 08/04/2010 | Listed for sale * | $207,900 | -- | $131 | AHL Inc | |
| 08/04/2010 | Listing removed * | $207,900 | -- | $131 | foreclosure.com | |
| 06/06/2010 | Price change * | $207,900 | -42.3% | $131 | foreclosure.com | |
| 05/29/2010 | Listed for sale * | -- | -- | -- | foreclosure.com | |
| 06/05/2007 | Sold | $360,000 | -24.2% | $228 | Public Record | |
| 08/22/2005 | Sold | $475,000 | 593% | $301 | Public Record | |
| 07/09/2001 | Sold | $68,500 | -50.4% | $43 | Public Record | |
| 07/16/1999 | Sold | $138,000 | -- | $87 | Public Record | |
| Fewer entries | | | *not included in calculating Zestimate | | | |

## Tax History

| Year | Taxes paid | % Change | Tax assessment | % Change |
|------|-----------|----------|----------------|----------|
| 2010 | $1,940 | -- | $179,000 | -- |
| 2009 | $1,940 | -63.1% | $179,000 | -48.4% |
| 2008 | $5,257 | -6.0% | $347,000 | -26.9% |
| 2007 | $5,590 | -- | $475,000 | -- |
| 2006 | $5,590 | 247% | $475,000 | 212% |
| 2005 | $1,612 | -- | $152,164 | -- |
| Fewer entries | | | | |

## Maps and Views

## Financing