BENJAMIN B. WAGNER
United States Attorney
Kyle Reardon
501 I Street, Suite 10-100
Sacramento, CA  95814
(916) 554-2700
(916) 448-2900 FAX

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES, | ) | CASE No. 2:09-CR-0037 MCE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| RALONDRIA STAFFORD, | ) | Date: Thursday, May 26, 2011 |
| NECOLE WARD, | ) | Time: 9:00 a.m. |
| | ) | Court: Hon. Morrison C. England |
| Defendants. | ) | |

The United States of America, by and through the undersigned attorney, respectfully submits this Sentencing Memorandum.  For the reasons provided below, the government recommends a sentence of 21-months imprisonment for Defendant Stafford and a sentence of 12 months and one day imprisonment for Defendant Ward.

I. BACKGROUND

On January 22, 2009, the Grand Jury returned an indictment charging the defendants with various counts of fraud relating to their sale of two residential properties.  C.R. 14.  On June 10, 2010, the defendants pleaded to count two, charging them with bank fraud in violation of 18 U.S.C. § 1344.  C.R. 63.

The defendants' pleas were entered pursuant to a plea

agreement. C.R. 65 (Stafford) and 66 (Ward). The plea agreements permitted a defense argument in mitigation at sentencing and capped the government's recommended sentence at the bottom of the applicable guideline range "as determined by the United States Probation Service." Id. In the agreements, the parties stipulated that the base offense level was seven; that they were free to argue for or against the application of any specific offense characteristics; and that they would not argue for any Chapter Three adjustments or cross-references not expressly stipulated to in the agreement. Id. Finally, the parties agreed that the United States Probation Office would determine the sentencing range. Id.

II. SENTENCING CALCULATION

  A. Statutory Maximum Sentence

The maximum sentence of imprisonment that may be imposed for a violation of 18 U.S.C. § 1344 is 20 years imprisonment, a fine of $1,000,000, and a three-year term of supervised release.

  B. Sentencing Guidelines Calculation

    1. Defendant Stafford

The Probation Officer found the loss in this case to be between $200,000 and $400,000 and applied a 12-level increase to the defendant's base offense level pursuant to USSG § 2B1.1(b)(1). PSR at ¶ 25. The Probation Officer also applied a two-level upward adjustment based upon the defendant's leadership role. Id. (applying USSG § 3B1.1(c)). Id. at ¶ 26.

    2. Defendant Ward

The Probation Officer found the loss in this case to be between $200,000 and $400,000 and applied a 12-level increase to the defendant's base offense level pursuant to USSG § 2B1.1(b)(1). PSR

at ¶ 29.  In addition, consistent with the parties' stipulation, the Probation Officer also applied a two-level downward adjustment for Defendant Ward's minor role in the offense pursuant to USSG § 3B1.2(b).  PSR at ¶ 31.

  C. The Probation Officer's Recommended Sentence

    1. Defendant Stafford

The Probation Officer recommends a 27-month sentence.  PSR at ¶ 65.  The Probation Officer also recommends a three-year period of supervised release.  Id. at "Justification and Recommendations."

    2. Defendant Ward

The Probation Officer recommends a 15-month sentence to be followed by a three-year term of supervised release.  PSR at ¶ 69 and "Justification and Recommendations."

III. GOVERNMENT'S RECOMMENDATION

The United States asks the Court to impose a 21-month sentence for Defendant Stafford[1] and a 12 month and one day sentence for Defendant Ward.  These sentences serve the sentencing goals of 18 U.S.C. § 3553.  In particular, these sentences are appropriate given the nature, circumstances, and seriousness of the defendants'

---

[1] As detailed supra, the plea agreements in this case prohibits the United States from seeking the application of any Chapter Three adjustments.  The plea agreements also charge the United States Probation Office with responsibility for determining the applicable guideline ranges and allow those ranges to be the basis upon which the United States may make its sentencing recommendations.

In this case, the Probation Officer applied a two-level increase to Defendant Stafford's offense level pursuant to USSG § 3B1.1(c) and determined the guideline range to be 27 to 33 months imprisonment.  Consequently, the United States believes that the unambiguous language in the plea agreement permits it to argue for a sentence of 27-months imprisonment.  Nonetheless, for the reasons stated in this sentencing memorandum, the United States is seeking a sentence below the applicable guideline range.

3

criminal acts. Id. at (a)(1), (2)(A). In addition, these sentences promote respect for the law and provide just punishment, are not disparate, and can effectively deter future criminal behavior. Id. at (2)(A)-(C).

A. The Nature, Circumstances, and Seriousness of the Offense Support the Government's Requested Sentences.

The defendants fraudulently sold two properties and pocketed more than $170,000 in proceeds. This money was used by the defendants for their own benefit. While couched in the language of the mortgage industry, the defendants' crimes amount to nothing more than theft. Quite simply, the defendants took money that did not belong to them and to which they would not have received had they not lied on mortgage loan applications. That this money came from a financial institution, or that the amount of money the defendants received was influenced by market forces in play at the time of their actions, is irrelevant to the analysis of what an appropriate sentence is in this case.

The parties cannot deny that had the defendants broken into a bank and stolen monies directly from a safe they would not be asking for sentences of home confinement. In the case of a bank robbery, the loss is direct and the harm readily apparent; in this case, the impact of the defendant's crime is diluted by time and the vagaries of the real estate business. Nonetheless, it is still bank robbery, and there is nothing about the facts in this case that make the defendant's crime any less serious.

The defendants lied to acquire monies to which they were not entitled. As a result of their lies, two financial institutions lost significant amounts of money. This fact alone justifies the United States' requested sentences.

B. The Defendants' Attempt to Shift the Blame for the Losses Caused by Their Conduct Demonstrates a Fundamental Disrespect for the Laws that They Violated.

1. The Loss in this Case Is an Accurate Calculation of the Harm Caused by the Defendants.

The defendants argue that the loss calculation in this case is overstated, and that the guideline range based in large part on that loss is unreasonable. Def. Stafford's Sent. Memo at 8:26-13:17 (joined by Defendant Ward in her sentencing memo at 1:18-19). According to the defendants, it was not their fraud that led to the losses in this case, but rather market forces. Def. Stafford's Sent. Memo at 8:18; Def. Ward's Sent. Memo at 1:18-23. This argument must fail because it is neither relevant to the inquiry in this case, nor does it adequately capture the defendant's role in creating those forces.

The loss in this case is readily quantifiable and the defendants do not to cite to any case in this Circuit in which a loss calculation was determined to be overstated due to market forces. Indeed, the cases from this Circuit cited by the defendant counsel the Court to take a "realistic, economic approach to determine the losses the defendant caused or intended to cause, rather than the use of some approach that does not reflect the monetary loss." Def. Stafford's Sent. Memo at 9:4-7 (citing United States v. Stoddard, 150 F.3d 1140, 1145-46 (9th Cir. 1998)(internal citations omitted)). There can be no more realistic economic approach than the one used in this case – the actual sale prices for the homes the defendants fraudulently sold to straw buyers.

The defendants lied in order to sell properties to straw buyers for more than what they were worth. When the straw buyers defaulted

on the mortgages that the defendants helped them acquire, the properties sold at foreclosure.  That the market changed during the intervening window is of little matter to the calculation of the defendant's loss.

   2. The Defendants Fail to Understand Their Role in Creating the Overheated Real Estate Market that They Now Blame.

The defendants cast blame for the consequences of their criminal conduct onto the broader real estate market that existed at the time of their fraud.  In making this argument, the defendants fail to acknowledge and adequately appreciate their roles in this offense.  At their core, the defendants' arguments are nothing more than an attempt to blame the victim for their crimes.

As a preliminary matter, the defendants' reading of the history of the Northern California housing market is selective and flawed.  The first fraudulent transaction in this case occurred in August 2005 with the resulting foreclosure in August 2006.  The second transaction closed in April 2006; the resulting foreclosure was in April 2007. In each case, the losses were approximately 20 percent.

However, according to publicly available data, home prices for all homes in Vallejo, California increased slightly from August 2005 through August 2006 ($445,200 to $451,500), the period of time during which Defendant Stafford's home at 230 Echo Summit went into foreclosure, and decreased less than 10 percent from April 2006 through April 2007 (458,700 to $428,400), the period of time during which Defendant Ward's home went into foreclosure.  See Exhibit A.  Any argument that the 20 percent losses in this case were driven by the crash in the Northern California real estate market is not supported by the evidence.

6

While a number of factors contributed to the size of the losses that occurred in this case, a key component was the fact that the prices at which the defendants sold their properties to the straw buyers was inflated. The defendants owned the properties at issue in this case. They also received the proceeds from their sale. Accordingly, the defendants' motivation to inflate the sale prices of their homes was immense.

There is evidence in this case to support the inference that the defendants artificially inflated the values of their homes in order to maximize their fraudulently-derived profits. In July 1999, the Defendant Stafford and her husband bought the four-bedroom house at 230 Echo Summit for $138,000. See Exhibit B. The price of the home at the time the defendants fraudulently sold in August 2005 was $475,000, an increase in value of 244 percent. However, for the same period, the rate of appreciation for four bedroom homes in Vallejo, California was only 193 percent ($191,300 to $561,700). See Exhibit C.

A similar story can be told about Defendant Ward's three-bedroom home at 9427 Berkshire Lane, Vallejo, California was also for an inflated price. Defendant Ward bought her home in December 2004 for $818,000. See Exhibit D. She and the defendant sold the house to a straw buyer in April 2006 for $1,000,000, an increase of 22 percent. During that same time frame, sales prices in Vallejo increased by only 16 percent for top-tier homes, see Exhibit E, and by 17 percent for three-bedroom homes, see Exhibit F.

The defendants seek to mitigate the losses resulting from their crimes by arguing that they could not foresee the possibility of a downturn in the housing market. Moreover, the defendants blame a

number of macroeconomic factors and systemic breakdowns in support of their arguments.  Def. Stafford's Sent. Memo at 10:4-17.  This argument fails to acknowledge the fact that it was the defendants who lied in order to assist their straw buyers in obtaining the loans at issue in this case.  The defendants' acts were not simply the result of a poor investment strategy or a failure of government regulators to adequately monitor the derivative market; they were the result of a deliberate fraud – a fraud in which the defendants met with and convinced straw buyers to go along with their lies, created bogus documents supporting the straw buyers' claimed incomes, filed paperwork riddled with false statements to support the loan amounts needed to purchase the properties, and finalized the paperwork necessary to complete the transactions.  That the defendants were not particularly adept at timing the market so as to avoid any losses in this case does not absolve them of responsibility for their crimes nor make them any less serious.

    Defendant Stafford blames "far more culpable speculators" for destroying the real estate market and creating the circumstances that led to her prosecution.  Def. Stafford's Sent. Memo at 9:26, n. 5.  Defendant Ward echoes that claim by saying that the "nationwide collapse of the real estate market" was the reason for the loss in this case, not she and her sister.  Def. Ward's Sent. Memo at 1:20-22.  This argument fails to appreciate that the defendant and her sister were two of the very same speculators they now blame for the losses in this case.  Disturbingly, the defendants' refusal to acknowledge their own complicity in the very system they now blame undermines any claims of remorse.  The crime in this case is fraud, not being on the wrong end of the Northern California real estate

bubble, and it is the defendants who are responsible for their lies and the damage they caused.

### C. The Requested Sentences Are Not Disparate.

#### 1. The Sentences of Each Defendant Accurately Reflect their Relative Culpability.

The United States requested sentences are reasonable in light of each defendant's relative culpability in this case. Defendant Stafford approached the straw buyers in this case and received the majority of the ill-gotten proceeds from the fraudulent sales. A 21-month sentence is appropriate.

As it concerns Defendant Ward, a sentence of 12 months and one day is reasonable. This sentence accurately captures Defendant Ward's lesser role in this case relative to her sister. In addition, it recognizes her cooperation with government officials and the role that her cooperation had in inducing her sister to plead guilty.

#### 2. Differences between Dissimilar Cases Does Not Indicate an Unwarranted Sentencing Disparity and Is Not a Basis for Departing from the Sentencing Guidelines.

Defendant Stafford argues that a 21-month sentence is disparate when compared to the sentences given to others convicted of multi-million dollar financial crimes. This argument selectively culls favorable sentences from the Second Circuit and fails to appreciate the unique differences present in each and every case. Given the facts of this case, a 21-month sentence for Defendant Stafford does not lead to an unwarranted sentencing disparity.

In United States v. Treadwell, 593 F.3d 990, 1011-12 (9th Cir. 2010), the Circuit Court dealt with the very argument being advanced by the defendant in her sentencing memo. In that case, the Circuit

Court noted that

> [t]he mere fact that Treadwell can point to a defendant convicted at a different time of a different fraud and sentenced to a term of imprisonment shorted than Treadwell's does not create an "unwarranted" sentencing disparity. For one thing, we aren't presented with the records in those cases on which Treadwell relies when he argues that other fraud defendants got off better than him. Moreover, sentencing disparity is only one factor a court considers in crafting an individualized sentence under § 3553(a). [Citation omitted.] A district court need not, and, as a practical matter, cannot compare every criminal defendant who has ever been sentenced before. Too many factors dictate the exercise of sound sentencing discretion in a particular case to make the inquiry [defendant] urges helpful or even feasible.

Such an inquiry is impractical in this case as well.

### D. The Requested Sentences Will Deter the Defendants and Others from Committing Future Misconduct.

A sentence of imprisonment is critical to protecting the public by deterring the defendants and others from future criminal behavior. 18 U.S.C. § 3553(a)(2)(B). An examination of the legislative history of 18 U.S.C. § 3553 shows deterrence to have been one of Congress's key considerations. See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006). In particular, Congress was concerned that prior to enactment of the sentencing guidelines, "major white collar criminals were [often] sentenced to small fines and *little or no imprisonment*." Id. at 1240 (quoting S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.S.C.A.N. 3182, 3259(emphasis added)(alteration in original). "Indeed, the Sentencing Commission, with its mandate from Congress to foster uniformity and proportionality in sentencing, 'has expressed concern that before the Guidelines, courts sentence[d] to probation an inappropriately high percentage of offenders guilty of certain

economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement....'" United States v. Whitehead, 559 F.3d 918 (9th Cir. 2009)(Gould, Circuit Judge, dissenting from the denial of rehearing on banc)(quoting U.S.S.G. § 1A1.1, Ch. 1, Pt. A.4(d) (2006)).  It is just such a sentence that the defendants seek in this case.

A sentence of imprisonment is necessary to deter future criminal behavior.  Empirical evidence has demonstrated that white collar criminals like the defendants have rates of recidivism that rival the general population, see David Weisburd, Elin Waring & Ellen Chayet, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crime*, Criminology, Vol. 33, 4 at 587-607.  While individuals like the defendant may have low rates of recidivism, the risk is not non-existent.

Just as important, however, is the general deterrent effect that a period of imprisonment may have on others in the community who consider engaging in similar fraudulent activities.  The defendants are the personification of a real estate culture that flaunted many of the requirements of the law and took risks with other people's money, caring little about the consequences because all too often there were none.  The cost of this culture's criminal activity is enormous.  Among commercial banks, the Federal Reserve reports that charge off rates for all loans rose from .74 in the third quarter of 2007 to 2.88 in the third quarter of 2009.  In light of these figures, the importance of general deterrence cannot be denied and white collar crimes are prime candidates for its application.  See Martin, 455 F.3d at 1240(citing Stephanos Bibas, *White-Collar Plea Bargaining After* Booker, 47 Wm. & Mary Law Rev.

721, 724 (2005)).

The amount of loss and rate of default are some indication of the pervasiveness of fraud. However, only a small number of cases are prosecuted at the federal level relative to the problem. Nationwide, statistics from the United States Sentencing Commission show nearly 6,800 sentences given for fraud offenses in 2009. See http://www.ussc.gov/sc_cases/USSC_2009_Quarter_Report_4th.pdf. The relative paucity of prosecutions compared to the problem means that the need for deterrence is real and that each sentence must have ramifications far beyond the individual defendant. Fraud is "difficult to detect, time-consuming to investigate, and costly to prosecute[.]" See Neal Shover & Andy Hochstetler, Choosing White Collar Crime 1-4, 167-68 (2006). To fail to sentence severely in cases such as this one undermines the "message of deterrence directed at those who willingly and knowingly have participated in similar activities but were not criminally charged." Id.

The government recognizes that the two fraudulent transactions in this case did not cause the collapse of the credit markets and the widespread defaults and foreclosures resulting there from. Nonetheless, the defendants are two small, but not insignificant, subset of individuals for whom credit was and remains nothing more than a commodity to be obtained at whatever cost. For these types of defendants, individuals driven by greed, willing to ignore the dictates of the law, and as yet unfazed and undeterred by the recent financial collapse, only confinement in a federal prison is likely to have a significant effect in curbing future criminal behavior. See David Weisburd, Ellen Chayet & Elin Waring, *Beyond General Deterrence in White Collar Crime: Empirical Evidence and Theoretical*

*Perspectives*, available at http://www.ncjrs.gov/App/Publications/abstract.aspx?ID=145153 (arguing that white collar offenders may be particularly influenced by criminal justice prosecution and sanctions).

IV.   CONCLUSION

The United States is keenly aware that a sentence of imprisonment will have a significant impact on each defendant and their families.  Nonetheless, none of these collateral consequences of the defendants' prosecution are so outside the normal consequences of criminal behavior to warrant the variances sought in this case.  See United States v. Carter, 560 F.3d 1107, 1121-22 (9th Cir. 2009)(observing that a defendant's prior history and circumstances must be so "atypical as to put [the defendant] outside the 'minerun of roughly similar' cases considered by the Sentencing Commission in formulating the Guidelines").  The United States believes that its recommended sentences is sufficient, but not greater than necessary to punish the defendants for their conduct and deter future criminal behavior.  Accordingly, for the reasons stated herein, the United States asks the Court to sentence Defendant Stafford to 21-months imprisonment, and to sentence Defendant Ward to 12 months and one day imprisonment.

DATED: May 24, 2011                    Respectfully Submitted,

                                       BENJAMIN B. WAGNER
                                       United States Attorney


                                  By:  _____
                                       KYLE REARDON
                                       Assistant U.S. Attorney

13